UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| MARY LEVENGOOD,<br>for Joshua Straiton (a Minor),<br><br>　　　　Plaintiff,<br><br>　　v.<br><br>JO ANNE B. BARNHART,<br>Commissioner of the Social<br>Security Administration,<br><br>　　　　Defendant. | No. ED CV 04-756-PJW<br><br>MEMORANDUM OPINION AND ORDER |

I.

INTRODUCTION

Joshua Straiton ("Joshua") is a minor child who suffers from a learning disorder. He was awarded supplemental security income ("SSI") benefits from June 1, 1999 until April 1, 2003, when the Social Security Administration (the Agency) determined that he was no longer disabled. Thereafter, Joshua's mother, Mary Levengood ("Plaintiff" or "Ms. Levengood"), applied to the Agency on his behalf seeking reinstatement of his SSI. After a hearing, the Agency denied her claim, finding that Joshua was no longer disabled. Plaintiff brings this action on behalf of Joshua pursuant to 42 U.S.C. §§ 405(g) and 1383(c)(3), seeking reversal of Agency's decision denying SSI.

Alternatively, she asks the Court to remand the case to the Agency for further proceedings.  For the reasons discussed below, the decision of the Agency is AFFIRMED, and this action is DISMISSED WITH PREJUDICE.

## II.

## BACKGROUND

Joshua Straiton was born on January 16, 1995.  (*See* Administrative Record ("AR") 75.)  At the time of the hearing, Joshua was eight-years-old and was enrolled in third-grade special education classes.  (AR 11, 209.)

At the age of four, Joshua was diagnosed with learning and expressive language disorders with mild to moderate mental retardation, although his overall level of intellectual functioning was in the low-average range.  (*See* AR 12-13.)  Plaintiff applied for benefits on his behalf, and, after the Agency determined that Joshua's condition met a Listing, Joshua was awarded SSI effective June 1, 1999.  (*See* AR 10, 75-78.)

On April 23, 2003, however, the Agency determined that Joshua's condition had improved such that his mental impairment was no longer disabling, effective April 1, 2003.  (AR 20-23.)  Plaintiff sought reconsideration of that decision, (*see* AR 25), and a disability hearing was held.  (*See* AR 31-42.)  After reviewing the evidence and interviewing Joshua and his parents, the disability hearing officer ("DHO") determined that Joshua's condition had improved, and found that he was no longer disabled.  (*See* AR 43-56.)

Plaintiff timely sought a hearing before an administrative law judge ("ALJ").  (AR 57.)  On September 23, 2003, Joshua appeared and

testified, (see AR 213-17, 221-23), as did his mother. (See AR 216-21.) In addition, the ALJ took testimony from Dr. Colin Hubbard, a medical expert. (See AR 223-28.)

At the hearing, Joshua testified that he knew his age and the city he lived in, but claimed not to know his address, date of birth, or the name of the city in which he was born. (See AR 215-17.) Joshua claimed to be tired at the hearing because he had stayed up late the night before the hearing to watch television; he explained that he liked to watch cartoons, particularly "Tom and Jerry." (AR 221-23.)

Plaintiff also testified. (See AR 216.) She explained her son's inability to recall his birthday by telling the ALJ that Joshua "gets confused," and confirmed that, although he had special education classes for approximately three hours per week, he was otherwise enrolled in general education classes at school. (See AR 217-19.) She stated that, in her view, Joshua was disabled because "he's a little slow" and "he's not like the other kids in his class," but was unable to reconcile this view with the fact that Joshua had received straight "A" grades in science, history, and social studies, and passing grades in all of his other subjects. (See AR 219-20.) Ms. Levengood stated that doctors were "supposed to" test him for ADD; when the ALJ pointed out that the lethargic demeanor Joshua displayed at the hearing did not seem consistent with ADD, she stated, "he mopes."[1] (AR 220-21.)

---

[1] "ADD" stands for Attention Deficit Disorder; "ADHD" stands for Attention Deficit/Hyperactivity Disorder. Diagnostic and Statistical Manual of Mental Disorders, Fourth Edition, Text Revisions (1994)

Dr. Hubbard testified next. (*See* AR 223.) He confirmed that Joshua has "a learning disorder and a speech and language disorder," particularly in the areas of reading, reading comprehension, and written expression, and that he "met the criteria for having a learning disability, and is eligible for social services." (AR 223-24.) The doctor added that, although Joshua's learning disorder was "severe," questionnaires completed by his teachers and more recent IQ scores indicated that his condition had improved. (AR 224-26.) Dr. Hubbard opined that Joshua's limitations were either non-existent or "less than marked" in every category, and concluded that, in his view, his condition did not meet or equal a Listing. (*See* AR 226-27.) The ALJ then adjourned the hearing. (*See* AR 228-29.)

On December 11, 2003, the ALJ issued his decision analyzing Plaintiff's claims under the three-step sequential evaluation process that the Agency applies to determine whether the condition of a previously-disabled minor has improved such that he is no longer disabled. (*See* AR 10-16.) At step one, the ALJ noted "that there has been significant medical improvement" in Joshua's learning and speech impairments since he had been found to be disabled. (*See* AR 12-13.) After reviewing the medical evidence, however, the ALJ determined that Joshua's impairments, although improved, remained "severe." (*See* AR 13-14.) At step two, the ALJ cited his summary of the medical evidence to support his determination that Joshua's learning and speech impairments had improved to the point that it no longer medically met or equaled any Listing. (*See* AR 14.) At step three, the ALJ concluded that, although Joshua's learning disability and speech impairments continued to limit him, they were not functionally equivalent to a Listing because the evidence did not show that he had

4

either two "severe" limitations or one "extreme" limitation.  (*See* AR 14-15 (citing 20 C.F.R. § 416.926a(b)(2).)  Accordingly, the ALJ found that Joshua had not been disabled since April 1, 2003.  (AR 15-16.)

Plaintiff timely sought review of the ALJ's decision.  (AR 7.)  The Appeals Council denied Plaintiff's request for review, however, and the decision of the ALJ became the final decision of the Agency.  (*See* AR 3-4.)  Plaintiff then filed her Complaint in this Court.

### III.
### STANDARD OF REVIEW

The district court reviews the decision of the ALJ to determine whether it is supported by substantial evidence and is not based on legal error.  *See Jamerson v. Chater*, 112 F.3d 1064, 1066 (9th Cir. 1997).  Substantial evidence "'means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'"  *Richardson v. Perales*, 402 U.S. 389, 401 (1971)(quoting *Consol. Edison Co. v. NLRB*, 305 U.S. 197, 229 (1938).)  It is "more than a mere scintilla but less than a preponderance," *Tidwell v. Apfel*, 161 F.3d 599, 601 (9th Cir. 1998), and "does not mean a large or considerable amount of evidence," *Pierce v. Underwood*, 487 U.S. 552, 565 (1988).

"The Court must uphold the ALJ's conclusion even if the evidence in the record is susceptible to more than one rational interpretation."  *Morgan v. Comm'r of Soc. Sec. Admin.*, 169 F.3d 595, 599 (9th Cir. 1999).  Indeed, if the record evidence reasonably can support either confirming or reversing the Agency's decision, this Court must not substitute its judgment for that of the ALJ.  *See Tackett v. Apfel*, 180 F.3d 1094, 1098 (9th Cir. 1999).

If the ALJ committed error but the error was harmless, reversal is not required.  *See Batson v. Comm'r of Soc. Sec. Admin.*, 359 F.3d

1190, 1197 (9th Cir. 2003)(applying the harmless error standard). If an incomplete record prejudiced the claimant, and if additional evidence could complete the record, remand is the appropriate remedy to allow the Agency to fully develop the record. *See Payan v. Chater*, 959 F.Supp. 1197, 1204-05 (C.D. Cal. 1996).

## IV.

## DISCUSSION

When Joshua was initially found to be disabled in 1999, the Agency had concluded that "the severity of his developmental delays functionally equaled the requirements of Listing 112.02." (AR 46.) That Listing, entitled "Organic Mental Disorders: Abnormalities in perception, cognition, affect, or behavior associated with dysfunction of the brain," requires the claimant to show:

> The history and physical examination or laboratory tests, including psychological or neuropsychological tests, demonstrate or support the presence of an organic factor judged to be etiologically related to the abnormal mental state and associated deficit or loss of specific cognitive abilities, or affective changes, or loss of previously acquired functional abilities.

20 C.F.R. Part 404, Subpt. 1, App. 1, § 112.02. "For children (age 3 to attainment of age 18)," Plaintiff was required to show no fewer than *two* impairments of "marked" severity or *one* impairment of "extreme" severity. *See id.* At the time of that 1999 decision, Joshua was found to have met Listing 112.02 because he had exactly two "marked" limitations: a "marked expressive communication disorder and marked adaptive (personal/behavior) functional limitations." (AR 46.)

By 2003, however, Joshua's condition had improved in a myriad of ways, the upshot of which being that he had no "marked" limitations or--at most--only one "marked" limitation. (See AR 15, 226.) Plaintiff alleges that the ALJ erred by shirking his duty to develop the record, specifically faulting him for failing to advise her that she could submit the results of a physician's psychological testing of Joshua for ADD or ADHD.[2] (See Joint Stip. at 3-4, 8-9.) For the reasons set forth below, however, the Court finds that the ALJ did not err, and that--even if he had--the error would be harmless.

A. The ALJ Did Not Fail in His Duty To Develop The Medical Record

Plaintiff alleges that the ALJ failed to fully develop the record by subpoenaing additional medical records of ADD or ADHD testing on Joshua or by allowing Plaintiff to supplement the record by submitting the records on her own. The record suggests, however, that there were no additional records then and that there are none now. Therefore, the ALJ did not err by not adding them to the record. Further, even if the records did exist and were included, the ALJ's decision is supported by substantial evidence and will be affirmed.

An ALJ has a duty to develop the record. See Smolen v. Chater, 80 F.3d 1273, 1288 (9th Cir. 1996). The ALJ's duty is heightened when the claimant is unrepresented by counsel at the hearing: "where the claimant is not represented, it is incumbent upon the ALJ to scrupulously and conscientiously probe into, inquire of, and explore for all the relevant facts." Higbee v. Sullivan, 975 F.2d 558, 561

---

[2] In the abstract, the impulsiveness or disturbance of concentration, attention, or judgment caused by ADD could, if sufficiently severe, supply a "marked" limitation. See 20 C.F.R. Part 404, Subpt. 1, App. 1, § 112.02(a)(8) and (10).

7

(9th Cir. 1992). The duty is further heightened in cases involving mental impairments. *See DeLorme v. Sullivan*, 924 F.2d 841, 849 (9th Cir. 1991). This duty is, however, triggered only when the evidence is ambiguous, or when the ALJ finds the record inadequate to allow for proper evaluation of the evidence. *See Smolen*, 80 F.3d at 1288; *see also Armstrong v. Commissioner of Soc. Sec. Admin.*, 160 F.3d 587, 590 (9th Cir. 1998). The ALJ may discharge this duty in several ways, including: subpoenaing the claimant's physicians, submitting questions to the claimant's physicians, continuing the hearing, or keeping the record open after the hearing to allow supplementation of the record. *See Tidwell*, 161 F.3d at 602; *see also Smolen*, 80 F.3d at 1288. Against these standards, the Court is confident that the ALJ fulfilled his duty to develop the medical record.

In October 2003, Ms. Levengood complained to doctors that Joshua was "really hyper, inattentive [at] home." (AR 201.) Solely on the basis of that complaint, doctors noted in Joshua's medical record on October 14, 2003, that they should "rule-out" ADHD. Accordingly, Ms. Levengood told the Agency that Joshua was "going to be tested for ADD." (AR 142.) Whatever Ms. Levengood's intentions may have been, however, it is clear that Joshua still had not been tested for ADD by the time the hearing was held in November 2003. The pertinent colloquy reads as follows:

> [Ms. Levengood]: [. . .] I was going to get the doctor to give [Joshua] ADD testing, too, but he never got back with me. [. . . .]
>
> [ALJ]: Well, [Joshua's] not looking--he's not on any medication for ADD or anything-

   [Ms. Levengood]: Not right now.  They were supposed to
test [Joshua] out.  The doctor didn't get back to me yet.
   [ALJ]: [Joshua's] not a person who looks like he's
overly energetic here.
   [Ms. Levengood]: Well, he gets like that.  He mopes or
gets like that--always tired.  Tires easy.
   [ALJ]: Well, my experience with ADHD, is even when
they're on medications, they're not able to sit still.  Why-
-frequently--
   [Ms. Levengood]: More like moping.  He's a moping type
like his sister.  Depressed.
   [ALJ]: Well, there's a lot of difference between
depression and ADHD--
   [Ms. Levengood]: Yeah.  That's what the doctor is
supposed to be testing for.  He never got back with me yet.
   [ALJ]: What kind of doctor?
   [Ms. Levengood]: It's Dr. Horace.  I'm supposed to
have a psychologist look at [Joshua], and he didn't get back
with me.  I have to get back with him, I guess, and find
out.  [. . . .]
(See AR 220-21.)
   As the foregoing colloquy makes plain, the test Ms. Levengood
described had *not* been administered to Joshua by the time of the
hearing.  Thus, contrary to Plaintiff's characterization of her
testimony at the hearing, Ms. Levengood did *not* tell the ALJ that
Joshua had been tested so that doctors could "distinguish between
depression and ADHD," as Plaintiff now claims.  (See Joint Stip. at
3.)  The ALJ reasonably interpreted this testimony to mean that Ms.

9

Levengood "wanted her son tested for attention deficit disorder." (AR 15.)

Based on this testimony, the Court cannot say that the ALJ erred by failing to subpoena the records, that apparently do not exist. Nor can the Court find that the ALJ erred by failing to leave the record open or to invite Plaintiff to submit more test results. Indeed, Ms. Levengood's testimony reasonably led the ALJ to believe that Joshua had not been given any ADD/depression testing. The record tended to confirm that no testing had been done, containing only a doctor's notation to "rule-out" ADHD based on Ms. Levengood's subjective complaint one month before the hearing.[3] (See AR 201.) Because Ms. Levengood testified that no ADHD test had been administered, the ALJ had few options. He could have concluded that Joshua had ADD/ADHD. But the ALJ is not qualified to diagnose a claimant's impairments, even though the record may contain some evidence that a claimant suffers from an impairment. See Mayes v. Massanari, 276 F.3d 453, 459 (9th Cir. 2001). Thus, the ALJ did the only thing he was permitted to do in this situation: take Ms. Levengood at her word that Joshua had not been tested for ADD/ADHD and render a decision on the evidence then in the record--knowing that, should Joshua later be tested, and should such tests indicate that he did suffer from ADD/ADHD, Joshua could file a new SSI application. For these reasons, Plaintiff cannot

---

[3] The Court observes that this "rule-out" notation was not a diagnosis. See Simpson v. Commissioner, Social Sec. Admin., No. CV 99-1816-JO, 2001 WL 213762, at *8 (D. Or. Feb. 8, 2001)(finding no reason to reject "the common sense assumption that 'Rule-Out' simply means that a particular diagnosis is neither ruled in nor ruled out by the examining physician" and rejecting "the assertion that a 'provisional' diagnosis creates a 'strong presumption' that the disorder exists").

show that the ALJ erred "[b]y failing to request that [she] obtain the testing results from Dr. Horace." (*See* Joint Stip. at 4.)

B. <u>Any Error Was Harmless</u>

The foregoing conclusion would, all by itself, justify granting summary judgment to the Agency. But even if the ALJ should have invited Plaintiff to obtain and submit the results of this test, the Court concludes that any error was harmless. *See Batson*, 359 F.3d at 1197. Where, as here, the ALJ's diligence in developing the record is at issue, remand is only required "if the claimant can show that omitted evidence prejudiced [his] hearing." *See Ladue v. Chater*, No. C-95-0754 EFL, 1996 WL 83880, at *4 (N.D. Cal. Feb. 16, 1996); *accord Duns v. Heckler*, 586 F.Supp. 359, 364 (N.D. Cal. 1984). "To establish prejudice, a claimant must demonstrate that he or she could and would have adduced evidence that might have altered the result." *Carey v. Apfel*, 230 F.3d 131, 142 (5th Cir. 2000)(citation and internal quotation marks omitted). Against this standard, the Court concludes that any error was harmless.

Despite Ms. Levengood's suggestion that because she was unrepresented by counsel during the Agency proceedings she was unaware that she could submit evidence after the hearing, (*see* Joint Stip. at 3), the record reflects that she knew she could submit additional evidence and was given a *written invitation* to do so. After the hearing, Ms. Levengood submitted a Request for Review, explaining that "I feel that [you] need more info to make [the decision]." (AR 7.) The Appeals Council understood this to be a request that it defer its decision until Plaintiff had a chance to submit additional evidence, and expressly advised her that "[y]ou may send us more evidence or a statement about the facts and the law in this case." (AR 5.) In the

same notice, the Appeals Council informed her that "[i]f we do not hear from you within 25 days, we will assume that you do not want to send us more information. We will then proceed with our action based on the record we have." (AR 6.) In fact, the Appeals Council waited 54 days; when no additional evidence was forthcoming, it rendered its decision. (See AR 3-4.) Plaintiff then retained counsel and initiated this lawsuit; significantly, however, Plaintiff has yet to produce any evidence suggesting that Joshua ever has been tested for ADD/ADHD--let alone that he actually suffers from this disability. (See Joint Stip. at 3-4.) Thus, Plaintiff cannot show that she "could and would have adduced evidence" that might have affected the ALJ's decision. See Carey, 230 F.3d at 142.

In any event, the record makes irrelevant Plaintiff's subjective understanding whether she could submit additional records after the hearing. On this issue, the ALJ explained:

> The concerns of [Joshua's] mother at the hearing regarding depression and ADD are not reflected in the school and medical records and are not pertinent since the record has established that regardless of the etiology [Joshua's] functioning is not markedly or extremely limited in this domain.

(AR 15.) After reviewing the record, the Court agrees with the ALJ's conclusion that whether or not Joshua had ADD/ADHD would be immaterial in the circumstances of this case.

After Plaintiff contested the discontinuation of Joshua's SSI in 2003, Dr. Clifford Taylor, a psychologist, examined the child at the Agency's request on April 4, 2003. (See AR 163-68.) Dr. Taylor noted that, as of the date of his examination, Joshua was a third-grade

student, was not enrolled in special education classes, and "presented with minimal anxiousness but no depression." (AR 165.) This doctor further described Joshua as "friendly and cooperative," "not easily overwhelmed," and opined that he was "able to engage in and sustain activity for a normal period of time." (See AR 167-68.) Although he noted that Joshua was "mildly distracted" and had "mild difficulty staying on task," Dr. Taylor emphasized that the child could be "easily redirect[ed]." (AR 165.) After testing Joshua with the Wechsler Intelligence Scale for Children - Third Edition ("WAIS-III"), Dr. Taylor concluded that his overall intellectual functioning was in the "Low Average" range, (AR 166), and pegged his Global Assessment of Functioning ("GAF") at 85.[4] (AR 167.) Each of these findings represented a significant improvement from the findings of the psychologist who had examined Joshua in 1999.[5] More importantly, ordering this consultative examination was an acceptable way for the ALJ to supplement an otherwise sparse medical record. See Reed v.

---

[4] Although Dr. Taylor did not assess Joshua's communicative skills, Joshua's speech and language development was tested on April 11, 2003, by Janet Lynn, MA, CCC, a licensed speech pathologist with Hilltop Speech and Language Services. (See AR 161-62.) Ms. Lynn concluded that, by 2003, Joshua suffered only "mild" receptive and expressive language deficits. (AR 162.)

[5] In support of Plaintiff's original application for benefits on behalf of her son, Joshua was tested on October 12, 1999 by Dr. Marsha H. Blasingame, an Agency examiner. (See AR 155-60.) After testing Joshua with the WAIS-III, Dr. Blasingame concluded that his full-scale IQ was in the range of 75-87, which placed him in the Low Average range. (See AR 158-59.) Tests of Joshua's expressive communication and adaptive behavior, however, placed him in the mildly-retarded range, although Dr. Blasingame did not diagnose mental retardation. (See AR 159-60.) This doctor fixed Joshua's at 65. (AR 160.)

*Massanari*, 70 F.3d 838, 841 (9th Cir. 2001); *see also* 20 C.F.R. § 416.919a.

The reports of school officials supported the Agency examiner's conclusions. Over the course of a three-day period in September 2003, Dr. Scott S. Gutentag, the psychologist at Joshua's elementary school, administered a battery of tests to Joshua, including the WAIS-III. (*See* AR 194-99). After noting that Joshua "was cooperative, pleasant, quiet," and "worked hard and carefully," Dr. Gutentag assessed his verbal skills in the "Low Average" range, his nonverbal abilities in the "Average," range, and opined that his Perceptual Organization IQ (which was 104) "should be used as the indicator of his current level of intellectual functioning." (AR 198.) A Teacher Questionnaire completed by Mr. David Linderman, Joshua's teacher from the prior year, generally corroborated this assessment, noting only a "slight" problem in "[f]ocusing long enough to finish assigned activity or task," and no "serious" or "very serious" problems in any category of functioning. (*See* AR 186-93.)

In light of this record, the Court agrees with the Agency's determination that Joshua's learning disability had improved such that he no longer met a listing by 2003. Although evidence of ADD could have helped Plaintiff rebut the weight of the evidence tending to show that Joshua no longer met Listing 112.02, neither the consultative psychological examination ordered by the Agency in April 2003, the examination performed by the psychologist at Joshua's elementary school in September 2003, nor the questionnaire submitted by Joshua's teachers that same year suggested that Joshua might have ADD or ADHD. Nor did any treating physician ever diagnose this impairment: instead, it is evident that Joshua had not been tested for ADD or ADHD at the

time of the November 2003 hearing, by the time the ALJ rendered his decision in December 2003, or before the Appeals Council's decision in April 2004. Indeed, to this day the record does not reflect that Plaintiff--who is now represented by counsel--ever obtained test results, a physician's diagnosis, or any other competent evidence that suggests that Joshua suffers from ADD or ADHD. In these circumstances, and because Plaintiff challenges no other aspect of the decision, the Court concludes that the ALJ satisfied his duty to develop the record, and finds that his failure to invite Plaintiff to submit additional evidence was harmless.

V.

CONCLUSION

For the reasons set forth above, this Court concludes that the Agency's findings are supported by substantial evidence and are free from material legal error. Therefore, the Court affirms the decision of the Agency and enters summary judgment in favor of the Agency and against Plaintiff.

IT IS SO ORDERED.

DATED:     March 16, 2006.


\_\_\_\_\_/s/_____
PATRICK J. WALSH
UNITED STATES MAGISTRATE JUDGE

S:\PJW\Cases-Soc Sec\LEVENGOOD\Memo Opinion.wpd